STATE OF VERMONT

| SUPERIOR COURT | ENVIRONMENTAL DIVISION |
| Environmental Division Unit | Docket No. 94-8-15 Vtec |

| | |
|---|---|
| Agency of Natural Resources, <br>      Petitioner <br><br> v. <br><br> Hugh McGee, <br> Eileen McGee, <br>      Respondents | DECISION ON THE MERITS |

The matter before the Court concerns Eileen and Hugh McGee's alleged unpermitted filling of a Class II wetland on property located at 326 Smalley Road in the Town of Brandon, Vermont (the Property). On September 10, 2013, Patrick Lowkes, an Environmental Enforcement Officer for the Vermont Agency of Natural Resources (ANR), served Hugh McGee with a Notice of Alleged Violation claiming that Hugh McGee had filled a Class II wetland on the Property without a permit, thus violating Section 9 of the Vermont Wetlands Rules.[1] On September 18, 2013, Eileen McGee responded by letter stating that the "property is and always has been an agricultural operation," and therefore, Ms. McGee explained, she would consider the notice of alleged violation to have been in error. ANR issued an Administrative Order (AO) for the violation on June 17, 2015, which was served on Eileen on July 28, 2015, ordering that Eileen and Hugh McGee remove all fill material from the wetland and pay a $10,000 fine.

On August 10, 2015, the McGees timely requested a hearing on the AO, claiming they were exempt from the Vermont Wetlands Rules as they are farmers and use the land where the alleged filling occurred for farming activities. During the initial status conference on August 24, the McGees requested a prompt hearing. Pursuant to 10 V.S.A. § 8012(c), the Court assigned this matter high priority in its trial schedule. On September 10, 2015, the Court conducted a site visit at the Property. Joining the Court on the site visit were Hugh, Eileen, and Riley McGee; ANR attorneys John Zaikowski and Randy J. Miller; and Environmental Enforcement Officer

---

[1] The Notice of Alleged Violation also referenced 10 V.S.A. § 1259(a), which prohibits discharges into waters of the State. There was no mention of 10 V.S.A. § 1259(a) in the Administrative Order and thus the Court will not address any potential violations of Vermont's water pollution control statute.

Patrick Lowkes. Following the site visit, a trial was held in the Superior Court in Rutland, Vermont. At trial, ANR was represented by John Zaikowski, Esq. and Randy J. Miller Esq.; the McGees were self-represented with Riley McGee speaking on their behalf.

In compliance with 10 V.S.A. §8012(c), this decision is issued 59 days from the date of the request for hearing.

Based upon the evidence presented at trial, including that which was put into context by the site visit, the Court renders the following Findings of Fact and Conclusions of Law.

**Findings of Fact**

1.      The Property consists of 28.36 acres and is located at 326 Smalley Road in the Town of Brandon, Vermont.

2.      Eileen McGee is the sole owner of the Property. Hugh McGee, Eileen's former husband, is at the Property daily to care for the horses and perform other work. Riley McGee, the adult son of Hugh and Eileen, is also involved in the upkeep and operation of the Property.

3.      Over the past thirty years, the McGees have used portions of the Property for various farming activities including raising and training horses, raising cattle, haying, and grazing.

4.      The Property spans Smalley Road and includes a house, barn, fields, and forested area. On the south side of Smalley Road, the land closest to the road consists of several paddocks and fields where the McGees pasture their horses. South of the paddocks lies a pond that they use to provide water for the horses. South and east of the pond is a large Class II wetland as depicted on the Vermont Significant Wetland Inventory Map.

5.      On-site inspection by Vermont District Wetlands Ecologist Julie Foley confirmed the presence and location of the Class II wetland as depicted on the Vermont Wetland Inventory Map. During her inspection she noted the presence of hydric soils and wetland vegetation.

6.      The McGees periodically use the wetland area south of the pond for grazing their horses. Mr. McGee testified that if he did not brush hog the area, it would become overgrown with plants and shrubs. The McGees have not actively cultivated the land south of the pond. When the McGees have let their horses roam in the wetland area, the horses eat whatever vegetation grows naturally. The only active management by Mr. McGee is occasional brush hogging. The McGees did hay some of the land south of the pond; however, this activity ceased a few years ago.

2

7. Sometime around August of 2013, ANR received a citizen complaint about a potential wetland violation on the Property.

8. On August 26, 2013, Patrick Lowkes visited the property to follow up on the complaint. When Mr. Lowkes arrived he saw Hugh McGee in an excavator dredging the pond south of the horse paddocks.

9. Mr. Lowkes observed that Mr. McGee was placing the dredged material on the southern bank of the pond.

10. Mr. Lowkes approached Mr. McGee and informed him that, although what he was doing did not appear to be a violation, he should be cautious of the Class II wetland immediately adjacent to the pond. Mr. Lowkes told Mr. McGee it would be a violation to place any dredged material in the wetland. Mr. Lowkes asked Mr. McGee to stop his dredging activity until Mr. Lowkes could return with a wetland ecologist to determine whether Mr. McGee would need a permit.

11. Mr. McGee responded that he was not intending to expand the pond and he would not stop because he had rented the excavator and only had it for a limited amount of time.

12. On August 29, 2013, Mr. Lowkes returned to the Property with Julie Foley, a state wetlands ecologist. Since Mr. Lowkes's August 26 visit, material was pushed south from the pond's embankment into the Class II wetland.

13. During Ms. Foley's inspection, the area south of the pond was overgrown with shrubs, brush, and other wetland vegetation. The brush was chest-high and thick on the date of her inspection.

14. On August 29, 2013, dredged material was piled on top of and around the vegetation from the pond bank and extended south beyond the bank and into the wetland.

15. Sometime after August 29, 2013, Mr. McGee pulled the material out of the wetland and back onto the pond's bank.

16. Neither Mr. Lowkes nor Ms. Foley made a follow up site visit after the August 29, 2013 visit. Mr. Lowkes did make some general observations from the road on a subsequent occasion.

17. Mr. Lowkes spent a total of 38.5 hours on this matter including site visits, correspondence, reporting, and trial preparation and testimony efforts. His hourly wage is $30 per hour.

18. Ms. Foley spent a total of 14 hours on this matter including site visits, assistance with drafting the Administrative Order and trial preparation and testimony efforts. Her hourly wage is $27 per hour.

## Conclusions of Law

There was little dispute at trial that Hugh McGee did place dredged material in a Class II wetland on the Property without a permit. The McGees argued, however, that they did not violate the Vermont Wetlands Rules because they are farmers and use their land for farming activities, and are therefore exempt from any permitting requirement. This defense implicates two distinct exceptions under the Vermont Wetlands Statute and corresponding Rules: the farming *exemption*, 10 V.S.A. § 902(5); 16-5 Vt. Code R. § 103:3.1(a), and the farming *allowed use*. See 10 V.S.A. § 913(a); 16-5 Vt. Code R. § 103:6.06.[2] For the following reasons, the Court concludes that the land on which Hugh McGee placed fill material does not qualify for the farming exemption, and that Hugh McGee's filling activities do not qualify as an allowed use. Therefore, the McGees violated the Vermont Wetland Rules by failing to obtain a permit before filling the Class II wetland on their property.

The Vermont Wetlands Statue requires that users of the State's significant wetlands obtain a permit, conditional use determination, or order from the Secretary before "conduct[ing] or allow[ing] to be conducted any activity in a significant wetland," unless they only engage in certain "allowed uses" enumerated by the Department of Environmental Conservation by rule. 10 V.S.A. § 913. The Statute defines wetlands as "those areas of the State that are inundated by surface or groundwater," but specifically excludes "such areas as grow food or crops in connection with farming activities" from this definition. 10 V.S.A. § 902(5); see also V.W.R. §§ 2.38, 3.1(a) (incorporating the statutory language). The Rules also authorize "the growing of food or crops in connection with farming activities" as an "allowed use"—i.e., a use for which no permit is required. V.W.R. § 6.06.

At issue in this matter are two exceptions to the Wetland Rules' permit requirement: first, the jurisdictional farming exemption for "such areas as grow food or crops," and second, the specific allowed use for "the growing of food or crops." These two exceptions are separate

---

[2] The Vermont Wetland Rules, codified at 16-5 Vt. Code R. §§ 103:1–10, will be cited and referred to as V.W.R. § ___.

and distinct provisions, with separate roles in the wetland permitting scheme. See Vt. Agency Nat. Res. v. Irish, 169 Vt. 407, 414–15 (1999). The farming exemption is jurisdictional because land that has been continuously farmed since 1990 is, by definition, not a wetland, and therefore activities on that land are beyond the scope of the Wetland Rules. See V.W.R. § 3.1(a); Irish, 169 Vt. at 414. The agricultural allowed use exception is narrower as it allows specific agricultural activities to take place in a wetland without a permit, but it does not take the wetland out of the scope of the Wetland Rules altogether. See V.W.R. § 6.06; Irish, 169 Vt. at 415.

### a. The Farming Exemption Under V.W.R. § 3.1(a)

The McGees argue that the strip of land to the south of their pond is exempt agricultural land under Section 3.1 of the Wetland Rules because they graze their horses on this land. The Court disagrees for two reasons.

First, the Section 3.1(a)(1) exemption does not apply to mere grazing, without more active cultivation. Section 3.1(a)(1) exempts "such areas as grow food or crops in connection with farming activities." Section 3.1(a)(2) defines "farming activities" as, in relevant part, "the cultivation or other use of land for . . . the growing of food and crops in connection with the raising, feeding, or management of livestock, poultry, equines, fish farms, or bees for profit." V.W.R. § 3.1(a)(2). The verb "grow" in the definition of "farming activities" is used in its transitive sense: the crops are grown, and the farmer grows them. Merely *allowing* vegetation to grow, even if this entails annual brush-hogging, is too passive to amount to "growing" the vegetation, as the word is used in Section 3.1(a)(2).

A comparison with federal and other states' wetland rules supports this interpretation. Many states' wetland permitting schemes also contain a farming exemption, but these statutes and rules typically make explicit mention of both "farming" and "grazing," suggesting that grazing and farming are distinct. See Con. Gen. Stat. § 22a-40(a)(1) ("The following operations and uses shall be permitted in wetlands and watercourses, as of right: (1) Grazing, farming, nurseries, gardening and harvesting of crops and farm ponds . . . ."); N.Y. Envtl. Conservation Law § 24-0701(4) (McKinney 2012) ("The activities of farms and other landowners in grazing and watering livestock . . . shall be excluded from regulated activities. . . ."). Furthermore, the federal regulations construing the Clean Water Act's "farming" exemption, see 33 U.S.C. §

5

1344(f)(1)(A), generally require physical measures to be applied directly to the soil in order to constitute "farming activities." See 33 C.F.R. § 323.4(a)(1)(i), (iii)(A), (iii)(B) (defining "farming activities" to include "cultivating," and defining cultivating as "physical methods of soil treatment employed . . . [on] crops to aid and improve their growth, quality or yield."). This comparison shows that "farming" entails more active cultivation than mere "grazing." Absent an explicit mention of "grazing" in the Rules, the Court concludes that, although the McGees brush hog the area in question and have their horses graze in the area, these activities do not constitute the "growing food or crops" under Section 3.1(a).

Second, even if merely grazing livestock on an area were a "farming activity" under Section 3.1, the McGees fail to show that the land has been continuously grazed since 1990, as is required under the farming exemption. See V.W.R. § 3.1(a)(3) ("The farming exemption shall apply to all areas used to grow food or crops in connection with farming activities including areas in ordinary rotation, as of the effective date of these rules. The exemption will expire whenever the area is no longer used to grow food or crops or in ordinary rotation."); see also V.W.R. § 1.1 (providing that the rules take effect in 1990). While Hugh McGee credibly testified that he has intermittently brush-hogged and hayed the land to the south of the pond since 1976, he also acknowledged that, at times, brush has reclaimed the south side of the pond and that he ceased haying a few years ago. Julie Foley, a Vermont Wetland Ecologist, credibly testified that the brush was chest high and thick on the date of her inspection in August 2013. Though Section 3.1 does allow for periods of nonuse in "ordinary crop rotation," this refers to strategic soil recovery periods in active crop cultivation, not unintentional disuse. Thus, given these significant periods of inattention, whatever exemption the land may have had over the decades has since been abandoned and expired.

Because the Court concludes that, absent any active cultivation, livestock grazing alone does not qualify as "farming activit[y]" under Section 3.1, the McGees' land does not qualify for the farming exemption. Alternatively, even if grazing alone were a qualifying farm activity, the land would still be nonexempt since the McGees fail to show that they conducted these activities continuously from 1990 to the present. The land to the south of the pond is therefore still within the purview of the Wetland Rules, and the McGees' filling without a permit is a violation of the Wetland Rules.

6

### b. The Allowed Use Exemption Under V.W.R. § 6.06

The McGees also implicate the distinct "allowed use" provision in Section 6.06 of the Wetland Rules. The McGees argue that their use of the pond for grazing is an allowed use for which no permit is required, and therefore placing fill in the grazing area is also exempt from the permit requirement.

The Court rejects this argument. Assuming the McGees' horse grazing is an allowed use under Section 6.06 of the Wetland Rules,[3] this does not give the McGees the right to place fill in the area of the wetland where the grazing takes place. The allowed uses in Section 6 of the Wetland Rules create an exception to permit requirements for the listed specific uses and nothing more. The first paragraph of Section 6 makes it clear that filling falls outside the scope of the allowed uses. It provides, "The following uses shall be allowed in a Class I or Class II wetland and in its buffer zone without a permit *provided . . . that no draining, dredging, filling, or grading occurs*." V.W.R. § 6.06 (emphasis added).[4] Therefore, even if grazing is an allowed use under Section 6.06, the McGees still cannot place fill material in the wetland area without a permit. Accordingly, the McGees fail to demonstrate that their filling activities were exempt from the permit requirement under the Wetland Rules.

### Penalty Assessment

When this Court determines that an environmental violation alleged by ANR in an administrative order has occurred, we are required to "determine anew the amount of a penalty" that should be assessed against the respondent who sought to challenge the ANR order. 10 V.S.A. § 8012(b)(1), (4). We therefore review the evidence before the Court and determine an appropriate penalty assessment, pursuant to the eight Subsections of 10 V.S.A. § 8010(b)(1)–(8).

---

[3] The Agency of Natural Resources represented at the hearing that the McGees' grazing activity was an allowed use. The Agency, however, did not provide any authority or analysis for this proposition. But, since the enforcement action before the Court takes issue with the McGees' filling and not their grazing activities, whether grazing constitutes an allowed use under Section 6.06 is not before the Court. The Court does encourage the Agency's balanced and practical approach to the need to protect the State's wetland resource while at the same time supporting the State's farming activities.

[4] Although several allowed uses such as silviculture, hydroelectric, and utility-maintenance uses contain exceptions to this limitation of scope and allow for dredging and filling incidental to the specific allowed uses, see V.W.R. §§ 6.01–04, 6.07, 6.08, 6.12–16, 6.22, the farming allowed use does not contain any such exception.

**Subsection (1)**: Subsection (1) requires consideration of "the degree of actual or potential impact on public health, safety, welfare and the environment resulting from the violation." Id. Respondents' violation of the Wetland Rules had potential adverse impacts on public health, safety, welfare, and the environment, given that the filling occurred in a large Class II wetland as depicted on the Vermont Significant Wetland Inventory Map. We impose a penalty of $2,000.00. We conclude that such a penalty is warranted and we decline to impose a more significant penalty under this subsection, since details of actual significant impacts on public health, safety, welfare, and the environment were not demonstrated by the evidence presented at trial.

**Subsection (2)**: Subsection (2) requires consideration of "the presence of mitigating circumstances, including unreasonable delay by the secretary in seeking enforcement." Id. The evidence presented of mitigating factors favoring Respondents includes Respondents fully remediating the filled area.

There is no evidence showing untimeliness of ANR's action. We therefore assess a credit to benefit Respondents for their prompt and complete remediation of $1,000.00.

**Subsection (3)**: Subsection (3) requires consideration of "whether the respondent[s] knew or had reason to know the violation existed." Id. The credible evidence shows that Respondents did have actual knowledge of the violation of the Vermont Wetland Rules. Mr. Lowkes told Mr. McGee it would be a violation to place any dredged material in the wetland. Although the McGees believed they were exempt from the permitting requirement, the McGees bore the risk of this incorrect interpretation. The McGees had the option to pause their site work activities and seek clarification of their interpretation. Based upon this evidence, we assess an additional penalty of $1,000 pursuant to this subsection as we feel that Respondents ignored the State's clear directive.

**Subsection (4)**: Subsection (4) requires consideration of "the respondent's record of compliance." Id. The record presented does not show that Respondents had previously violated ANR's regulations. Given the Respondents' clean record of compliance, we decline to assess any additional penalty pursuant this subsection.

**Subsection (5)**: This subsection has been repealed.

**Subsection (6)**: Subsection (6) requires consideration of "the deterrent effect of the penalty." Id. In reviewing the importance of establishing a penalty that will have a deterrent

8

effect upon Respondents, based upon the evidence before the Court, we see no need to impose an additional penalty and hope and expect that the penalty in Subsection (1) will be sufficient deterrent for Respondents to avoid future violations.

**Subsection (7)**: Subsection (7) requires that we consider "the state's actual cost of enforcement." Id. The value of the time that all ANR officials committed to responding to Respondent's violation, including prosecution of this matter, totals $1,647. We direct Respondents to reimburse these costs as an additional penalty for the violation.

**Subsection (8)**: Subsection (8) requires consideration of "the length of time the violation has existed." Id. At the time of trial, the credible evidence showed that Respondents took appropriate and prompt measures to remedy the violation. We therefore impose no additional penalty.

ANR provided no evidence on the likely cost avoided by the violation. We understand that Respondents ultimately and fully remedied the compliance issues, and thus, incurred a similar cost of that which was originally avoided. We therefore do not impose any amount of additional penalty relating to cost avoidance.

## Conclusion

For the foregoing reasons, the Court concludes that the McGees violated Vermont Wetland Rules Section 9 by placing fill in a wetland without a permit when the land was not exempt and the act of filling was not an allowed use. The McGees need not conduct any further remediation work. Hugh McGee credibly testified that he removed all the fill material from the wetland. ANR did not perform any follow up investigation to confirm or deny this claim and, at the hearing, ANR did not argue that the site requires additional remediation.

Due to their violation, the McGees shall be jointly and severally liable for a total penalty in these proceedings of **$3,647.00**. Because Hugh McGee placed unpermitted fill in a wetland and Eileen McGee, as owner of the subject property, allowed the activities, the McGees are jointly and severally liable. See 10 V.S.A. § 913 ("[N]o person shall conduct or allow to be conducted an activity in a significant wetland or buffer zone . . . ."); see also Secretary v. Persons, No. 97-6-10 Vtec, at 10 (Vt. Super. Ct. Envtl. Div. Aug. 1, 2012) (Durkin, J.) (holding violator and owner of underlying land jointly and severally liable for a wetlands violation).

## Rights of Appeal (10 V.S.A. § 8012(c)(4)–(5))

This Decision and the accompanying Judgment Order will become final if no appeal is requested within 10 days of the date this Decision is received. All parties to this proceeding have a right to appeal this Decision and Judgment Order. The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to superseding provisions in Vermont Rule for Environmental Court Proceedings (V.R.E.C.P.) 4(d)(6). Within 10 days of the receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of the Environmental Division of the Vermont Superior Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court. 10 V.S.A. § 8013(d). A party may petition the Supreme Court for a stay under the provisions of the Vermont Rules of Civil Procedure (V.R.C.P.) 62 and V.R.A.P. 8.

A Judgment Order accompanies this Decision. This concludes the current proceedings before this Court.


Electronically signed on October 09, 2015 at 11:31 AM pursuant to V.R.E.F. 7(d).


_Tom Walsh_
_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division